**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| JANE DOE (M.J.J.) an individual, | |
| Plaintiff, | |
| v. | CIVIL ACTION NO: |
| WYNDHAM HOTELS & RESORTS, INC.; LQ MANAGEMENT, LLC; LA QUINTA FRANCHISING, LLC; LA QUINTA HOLDINGS, INC; SUPER 8 MANAGEMENT, INC.; HEER B. PATEL; PRAVIN G. PATEL; HASU PATEL, INDIVIDUALLY AND AS TRUSTEE OF THE PATEL FAMILY TRUST; AND TARA PATEL, | |
| Defendants. | |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff Jane Doe (M.J.J.) files this Original Complaint against WYNDHAM HOTELS & RESORTS, INC.; LQ MANAGEMENT, LLC; LA QUINTA FRANCHISING, LLC; LA QUINTA HOLDINGS, INC; SUPER 8 MANAGEMENT, INC.; HEER B. PATEL; PRAVIN G. PATEL; HASU PATEL, INDIVIDUALLY AND AS TRUSTEE OF THE PATEL FAMILY TRUST; AND TARA PATEL as Defendants and respectfully shows the Court as follows:

## SUMMARY

1.      Jane Doe (M.J.J.) files this civil lawsuit seeking compensation for the harm she suffered as a result of the sex trafficking she endured at Super 8 and La Quinta hotels; owned, operated, maintained, and controlled by Defendants and their agents and employees.

2.      Sex trafficking is the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purposes of causing the person to engage in a

1

commercial sex act either (1) before the person turns 18 years old; or (2) through force, fraud, or coercion.[1] Traffickers or 'pimps' use threats, violence, manipulation, lies, debt bondage, and other forms of coercion to compel adults and children to engage in commercial sex acts against their will.

3.      Sex trafficking has become a public health crisis that has reached epidemic proportions in the United States. It is now widely recognized, including by Congress and many state legislatures, that combating sex trafficking requires more than just criminal penalties for pimps and sex buyers.

4.      Since 2003, federal law, through the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. §1581, et seq, has provided victims of sex trafficking a civil remedy against perpetrators of criminal sex trafficking.

5.      In 2008, Congress recognized the need to extend liability beyond sex buyers and sellers and intentionally expanded the scope of the TVPRA to reach those who—while not criminally liable under the TVPRA—financially benefit from participation in a venture that they know or *should know* engages in criminal sex trafficking.

6.      As discussed herein, Defendants derived financial benefit from facilitating sex trafficking by providing venues where traffickers could exploit victims, including victims like Jane Doe (M.J.J.) with minimal risk of detection or interruption. Defendants continued supporting traffickers, including Jane Doe (M.J.J.)'s trafficker, despite evident and apparent signs of widespread and ongoing sex trafficking in these hotels. Defendants were, therefore, knowingly receiving a benefit from participation in a venture that Defendants knew or should have known was engaged in sex trafficking.

---

[1] 18 U.S.C. §1591; 22 U.S.C. § 7102.

## PARTIES

7.      Plaintiff, Jane Doe (M.J.J.) is a resident of California. She may be contacted through her lead counsel, whose information is contained below.

8.      Jane Doe (M.J.J.) is a victim of sex trafficking under 18 U.S.C. §1591(a) because she was harbored, transported, or provided for the purpose of causing her, through force, fraud or coercion, to commit a commercial sex act.

9.      The trafficking of Jane Doe (M.J.J.) occurred in or affected interstate commerce.

10.      Given the nature of the allegations in this lawsuit, there is a collective and compelling interest in not publicly revealing the identity of Jane Doe (M.J.J.).

11.      Wyndham Hotels & Resorts, Inc. is a for-profit Delaware corporation with its principal place of business in Parsippany, New Jersey. Defendant Wyndham Hotels and Resorts, Inc. may be served through its registered agent for service Corporate Creations Network Inc. at 3411 Silverside Road, Rodney Building #104, Wilmington, Delaware 19810.

12.      All references to Wyndham Hotels and Resorts, Inc. include any department, division, office, agency, subsidiary, corporate affiliate, predecessor corporation, or successor corporation, whether domestic, foreign, and/or international. The term also includes any director, officer, agent (either with direct/actual authority or implied/apparent authority), employee, person, firm, or corporation acting on behalf of Wyndham Hotels and Resorts, Inc. now or at any time relevant to the claims herein.

13.      LQ Management, LLC is a for-profit Delaware limited liability company with its principal place of business in Parsippany, New Jersey. Defendant Wyndham Hotels and Resorts, Inc. may be served through its registered agent for service Corporate Creations Network Inc. at 1521 Concord Pike, Suite 201, Wilmington, Delaware 19803.

14.     La Quinta Franchising, LLC is a Nevada limited liability company with its principal place of business in Parsippany, New Jersey. Defendant La Quinta Franchising, LLC may be served through its registered agent for service Corporate Creations Network Inc. at 1521 Concord Pike, Suite 201, Wilmington, Delaware 19803.

15.     La Quinta Holdings, LLC is a Delaware limited liability company with its principal place of business in Parsippany, New Jersey. Defendant La Quinta Holdings, LLC may be served through its registered agent for service Corporate Creations Network Inc. at 1521 Concord Pike, Suite 201, Wilmington, Delaware 19803.

16.     Super 8 Management, Inc. is a South Dakota corporation with its principal place of business in Parsippany, New Jersey. Defendant Super 8 Management, Inc. may be served through its registered agent for service The Prentice-Hall Corporation System, Inc. at 251 Little Falls Drive, Wilmington, Delaware 19808.

17.     Wyndham Hotels & Resorts, Inc., LQ Management, LLC, La Quinta Franchising, LLC, La Quinta Holdings, Inc., and Super 8 Management, Inc. will be referred to as "Wyndham" or "Franchisor Defendants."

18.     Heer B. Patel can be served at 11 Volta Del Tintori Street, Lake Elsinore, California 92532, or wherever he may be found.  At all relevant times, Heer B. Patel owned the Super 8 hotel located at 225 E. Hospitality Lane, San Bernardino, California 92408.  Heer B. Patel, will be referred to as a "Franchisee Defendant."

19.     Pravin G. Patel can be served at 11 Volta Del Tintori Street, Lake Elsinore, California 92532, or wherever he may be found.  At all relevant times, Pravin G. Patel owned the Super 8 hotel located at 225 E. Hospitality Lane, San Bernardino, California 92408.  Pravin G. Patel, will be referred to as a "Franchisee Defendant."

20.     Tara Patel can be served at 13055 San Fernando Road, Sylmar, California 91342, or wherever she may be found.  At all relevant times, Tara Patel owned the Super 8 hotel located at 225 E. Hospitality Lane, San Bernardino, California 92408.  Tara Patel, will be referred to as a "Franchisee Defendant."

21.     Hasu Patel, both individually and as trustee of the Patel Family Trust, can be served at 93 Plaza Avila, Lake Elsinore, California 92532, or whereever he may be found.  At all relevant times, Hasu Patel, individually and as trustee of the Patel Family Trust, owned the Super 8 hotel located at 225 E. Hospitality Lane, San Bernardino, California 92408.  Hasu Patel will be referred to as a "Franchisee Defendant."

<u>**JURISDICTION AND VENUE**</u>

22.      This Court has jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the TVPRA.

23.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because one or more Defendants reside in this district.

24.     All Wyndham Defendants have the same principal place of business, which is in Parsippany, New Jersey, within the District of New Jersey. Therefore, each of the Wyndham Defendants is a resident of the District of New Jersey for the purpose of § 1391(b)(1).

25.     Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in the District of New Jersey.

## STATEMENT OF FACTS

**I.      Jane Doe (M.J.J.) was a Victim of Unlawful Sex Trafficking at a Hotel Owned, Operated, Managed and Controlled by Defendants.**

26.      Jane Doe (M.J.J.) was trafficked through force and coercion by her trafficker to engage in numerous commercial sex acts.  Jane Doe (M.J.J.) was trafficked continuously between January 1, 2010 and May 28, 2014, including at the following Wyndham locations:

      a.   Super 8, located at 225 E. Hospitality Lane, San Bernardino, California 92408; and

      b.   La Quinta, located at 205 E. Hospitality Lane, San Bernardino, California 92408.

27.      Jane Doe (M.J.J.)'s trafficking repeatedly occurred in rooms of these Wyndham locations and was facilitated by the Wyndham Defendants.

**II.     The Hotel Industry's Role in Sex Trafficking and Defendants' Knowledge of the Problem.**

28.      While the widely known and pervasive relationship between sex trafficking and the hotel industry necessarily shapes what Wyndham Defendants knew or should have known regarding the trafficking at their hotel properties, trafficking activity, including that of Jane Doe (M.J.J.), was pervasive and apparent at the locations at issue.

29.      Today, sex slavery is pervasive in the United States, and hotels are the primary place where it happens.[2] For years, sex traffickers have "been able to reap enormous profits with little risk when attempting to operate within hotels."[3] In 2014, 92 percent of calls to the Human

---

[2] "This is not only a dominant issue, it's an epidemic issue." *See* Jaclyn Galucci, *Human Trafficking is an Epidemic in the U.S. It's Also Big Business*, Fortune, April 2019, at https://fortune.com/2019/04/14/human-sex-trafficking-usslavery/ citing Cindy McCain, who chairs the McCain Institute's Human Trafficking Advisory Council. "It's also something that is hiding in plain sight. It's everywhere—it's absolutely everywhere." *Id*
[3] *See Human Trafficking in the Hotel Industry*, Polaris Project, February 10, 2016, at https://polarisproject.org/blog/2016/02/human-trafficking-in-the-hotel-industry/.

Trafficking Hotline involved reports of sex trafficking taking place at hotels.[4] Hotels have been found to account for over 90 percent of commercial exploitation of children.[5]

30.    Because of this link between hotels and sex trafficking, government agencies and non-profits have devoted significant efforts to educating the hotel industry, including Defendants, on best practices for identifying and responding to sex trafficking.[6]

31.    Multiple agencies and organizations who actively combat sex trafficking, including the United States Department of Homeland Security, the National Center for Missing and Exploited Children, the Polaris Project, the Texas Attorney General, Love 146, and EPCAT, among others, have established recommended policies and procedures for recognizing the signs of sex trafficking.[7]

32.    Some of the recommended policies and procedures intended to reduce or eliminate sex trafficking, which Defendants are aware or should be aware of, includelearning to identify warning signs and indicators of sex trafficking, including but not limited to:

    a.    Individuals show signs of fear, anxiety, tension, submission, and/or nervousness;

---

[4] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hospitality Industry*, CORNELL HOSPITALITY REPORT, 15(15), 3-10 (2015), available at: https://humantraffickingsearch.org/wp-content/uploads/2019/05/Adoptingthecode.report.cornell.pdf

[5] Erika R. George & Scarlet R. Smith, *In Good Company: How Corporate Social Responsibility Can Protect Rights and Aid Efforts to End Child Sex Trafficking in Modern Slavery*, 46 N.Y.U. J. INT'L L. & POL. 55, 92 (2013).

[6] *See, e.g.*, Department of Homeland Security, *Blue Campaign Toolkit*, available at: https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf; National Center for Missing & Exploited Children, *Child Sex Trafficking Overview*, available at: https://www.missingkids.org/content/dam/missingkids/pdfs/CST%20Identification%20Resource.pdf; Love 146, *Red Flags for Hotel and Motel Employees*, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf; Texas Attorney General, Human Trafficking Red Flags, available at: https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf .

[7] United States Department of Homeland Security Blue Campaign – One Voice. One Mission. End Human Trafficking, https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf (last visited April 13, 2023);National Center for Missing and Exploited Children, https://www.missingkids.org/theissues/trafficking#riskfactors (last visited April 13, 2023); Love 146, *Red Flags for Hotel & Motel Employees*, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf (last visited April 13, 2023); Texas Attorney General, *Human Trafficking Red Flags*, https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf (last visited April 13, 2023).

b.  Individuals show signs of physical abuse, restraint, and/or confinement;

c.  Individuals exhibit evidence of verbal threats, emotional abuse, and/or being treated in a demeaning way;

d.  Individuals show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior;

e.  Individuals lack freedom of movement or are constantly monitored;

f.  Individuals avoid eye contact and interaction with others;

g.  Individuals have no control over or possession of money or ID;

h.  Individuals dress inappropriately for their age or have lower quality clothing compared to others in their party;

i.  Individuals have few or no personal items—such as no luggage or other bags;

j.  Individuals appear to be with a significantly older "boyfriend" or in the company of older males;

k.  A group of girls appears to be traveling with an older female or male;

l.  A group of males or females with identical tattoos in similar locations.  This may indicate "branding" by a trafficker;

m.  Drug abuse or frequent use of "party drugs" such as GHB, Rohypnol, Ketamine, MDMA (Ecstasy), Methamphetamines, Cocaine, and Marijuana;

n.  Possession of bulk sexual paraphernalia such as condoms or lubricant;

o.  Possession or use of multiple cell phones; and

p.  Possession or use of large amounts of cash or pre-paid cards.[8]

33.   The signs of sex trafficking in a hotel environment follow well-established patterns and can easily be detected by appropriately trained staff. Tool kits specific to the hotel industry have been developed, which help hotel staff in every position identify and respond to signs of sex

---

[8] *Id.*

trafficking.[9]  From check-in to check-out, there are indicators that traffickers and their victims routinely exhibit during their stay at a hotel.

34.     The relationship between a pimp and a prostitute is inherently coercive, and the United States Department of Justice and other agencies and organizations have recognized that most individuals involved in prostitution are subject to force, fraud, or coercion.[10] It is also well understood that "prostitution," "sex trafficking," and "child sex trafficking" involve a single common denominator, the exchange of sex for money.

35.     The definition of sex trafficking in the TVPRA under 18 U.S.C. §1591(a)(1) incorporates the definition of commercial sex act. Defendants understood the practical and legal association between commercial sex and sex trafficking in a hotel environment. Thus, Defendants knew or should have known that signs of commercial sex (prostitution) activity in their hotels were in fact signs of sex trafficking.[11]

36.     All Defendants were aware or should have been aware of these signs of sex trafficking when operating, controlling, and managing their hotel properties, when enacting and enforcing policies and procedures applicable to those hotels and when training, educating, and supervising the staff of that hotel.

37.     The most effective weapon against sexual exploitation and human trafficking is education and training.[12]  As ECPAT concluded:

---

[9] Department of Homeland Security, *Blue Campaign Toolkit*,
https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf.
[10] *See, e.g.*, *A National Overview of Prostitution and Sex Trafficking Demand Reduction Efforts, Final Report*,
https://www.ojp.gov/pdffiles1/nij/grants/238796.pdf; *Prostitution and Trafficking in Women: An Intimate Relationship*, https://www.ojp.gov/ncjrs/virtual-library/abstracts/prostitution-and-trafficking-women-intimate-relationship.
[11] *Id.*
[12] Polaris, *Recognizing Human Trafficking*, https://polarisproject.org/recognizing-human-trafficking/ (last visited April 13, 2023).

The hospitality industry is in a unique position to identify and report human trafficking due to its perceived anonymity. Traffickers believe they can go unnoticed while exploiting victims across the globe in hotels— ranging from budget properties to luxury resorts. From check-in to check-out, there are a number of indicators victims and exploiters exhibit during the time they are on a hotel property.[13]

38.     This same conclusion is echoed by others who seek to eliminate sex trafficking in the hospitality industry, including the American Hotel Lodging Association: "Hotel employees who have undergone training are more aware of trafficking when it happens – and are more willing to report it – than those who have not been trained.[14]  In reference to companies like the Defendants, ECPAT observed: "If they do nothing to raise awareness or to prevent child trafficking, they risk becoming an indirect and unintentional conduit for the abuse that takes place."

39.     Given the prevalence of human trafficking in hotels and the abundance of information about how franchisors, owners, operators and hotel employees can identify and respond to this trafficking, it has become apparent that the decision of a hotel chain to continue generating revenue from traffickers without taking necessary steps to identify and prevent trafficking in its hotels is a conscious decision to financially benefit by supporting and facilitating unlawful sex trafficking.

40.     Each of the Wyndham Defendants had a responsibility to adopt, implement, and adequately enforce policies to avoid facilitating sex trafficking and to train hotel staff to identify and respond to "red flags" of sex trafficking.

41.     Unfortunately for Jane Doe (M.J.J.), the promises made by the Wyndham Defendants have proven empty. Defendants have failed, at all levels, to take appropriate action in response to their knowledge of widespread and ongoing human trafficking in their hotels. Instead,

---

[13] ECPAT USA, *Training for Hotel Associates*, https://www.ecpatusa.org/hotel-training (last visited April 13, 2023). *See also* Carolin L. et al., *Sex Trafficking in the Tourism Industry*, J. Tourism Hospit. (2015), https://www.longdom.org/open-access/sex-trafficking-in-the-tourism-industry-2167-0269-1000166.pdf.
[14] AHLA, *Free Online Training*, https://www.ahla.com/issues/human-trafficking (last visited April 13, 2023).

they have continued financially benefiting by providing venues for the sexual exploitation of victims like Jane Doe (M.J.J.).

**III.    Sex Trafficking Has Long Been Prevalent at Wyndham Branded Properties, and Defendants Have Known About It.**

42.    Defendants' actual knowledge is *not* limited to a general awareness of the problem of sex trafficking in the hotel industry. Each of the Defendants has known, since well before Jane Doe (M.J.J.)'s trafficking, that sex trafficking was ongoing and widespread at Wyndham branded properties including the subject properties named herein.

**a.  Sex Trafficking at Wyndham Branded Hotels was well Known by Defendants**

43.    Upon information and belief, each of the Defendants monitored criminal activity occurring at Wyndham branded hotels and were aware of activity indicating commercial sex, sex trafficking and/or related crimes occurring at those branded hotels, including the specific hotel property where Jane Doe (M.J.J.) was trafficked.

44.    Scores of news stories from across the US highlight Wyndham's facilitation of sex trafficking and certainly establish that Defendants knew, or should have known, of the use of Wyndham hotels for sex trafficking.

45.    Information that has become public through news stories establishes the entrenched and pervasive nature of Wyndham's role in providing a venue where sex trafficking has continued unabated for years. Among notable press involving the frequent use of Wyndham hotels for illegal activity, the following was noted:

- "Man arrested in Metairie on human trafficking charges; accused of forcing North Carolina teens into prostitution"[15]

---

[15] *Man arrested in Metairie on human trafficking charges; accused of forcing North Carolina teens into   prostitution*, NOLA.com (Jul 20, 2010), Man arrested in Metairie on human trafficking charges; accused of forcing North Carolina teens into prostitution | Crime/Police | nola.com

- "Federal officials catch, arrest man alleged to have prostituted Jupiter girl, 14"[16]

- "Hagerstown man charged with trafficking of two teenage girls"[17]

46. Ultimately, several hundred traffickers involved with hundreds of victims have been prosecuted by state and federal law enforcement agencies for sex trafficking and forced prostitution out of Wyndham branded properties.

47. Based on information and belief, the Wyndham Defendants managed and monitored on-line reviews of Wyndham hotel locations:

- A Booking.com review from September 29, 2021 states: "Negative: The cops pulled us over after we left the parking lot. They told us that this motel was known fir [sic] drugs and sex rings"[18]

- A Google.com review from 2018 states: "Problem I have is owner. He treats women very poorly and makes his underage children work there. A lot of prostitution that I'm sure owner aware of. I seen him talking to this guy that has checked in 3 different times with 3 different [sic]"[19]

- A Trip Advisor review from June 20, 2014 states: "I witnessed what seemed to be prostitution in and out of the hotel. A huge party went on "in the hallways" well into the night with full tilt hip hop music. The following morning I experienced a naked woman being attacked in the hallway and had to intervene when not one other hotel security, management came to help."[20]

---

[16] *Federal officials catch, arrest man alleged to have prostituted Jupiter girl, 14,* The Palm Beach Post (March 31, 2012) https://www.palmbeachpost.com/story/news/crime/2012/02/08/federal-officials-catch-arrest-man/7283405007/

[17] *Hagerstown man charged with trafficking of two teenage girls,* Herald Mail Media (July 1, 2015) Hagerstown man charged with trafficking of two teenage girls (heraldmailmedia.com)

[18] https://www.booking.com/hotel/us/days-inn-clarksville-tn.html

[19] https://www.google.com/travel/hotels/Days%20Inn%20127%20W%20Byers%20Ave,%20New%20Stanton,%20PA%2015672%20google/entity/CgoIiJGz_YeevpIDEAE/prices?g2lb=2502548,2503771,2503781,4258168,4270442,4284970,4291517,4306835,4429192,4515404,4597339,4723331,4731329,4757164,4778035,4814050,4821091,4861688,4864715,4874190,4886082,4886480,4893075,4902277,4905351,4926165,4926489,4931360,4936396,4937897,4940607,47061553&hl=en-US&gl=us&ssta=1&q=Days+Inn+127+W+Byers+Ave,+New+Stanton,+PA+15672+google&grf=EmMKLAgOEigSJnIkKiIKBwjnDxAEGBASBwjnDxAEGBEgADAeQMoCSgcI5w8QARgfCjMIDBIvEi2yASoSKAomCiQweDg4MzRkOTA1ZjM5OTA5YmQ6MHgzMjRmMGYwN2ZhY2M4ODg&rp=EliRs_2Hnr6SAxCIkbP9h56-kgM4AkAASAHAAQI&ictx=1

[20] https://www.tripadvisor.com/Hotel_Review-g60097-d1571552-Reviews-Days_Inn_Suites_by_Wyndham_Milwaukee-Milwaukee_Wisconsin.html

48. This sampling of news stories, reviews, and other public information establishes that, at the time Jane Doe (M.J.J.) was trafficked at the subject properties, the Wyndham Defendants knew or should have known that:

    a. There was widespread and ongoing sex trafficking occurring at Wyndham branded properties;

    b. Sex trafficking was a brand-wide problem for Wyndham originating from management level decisions at their corporate offices in Carrollton, Texas;

    c. Wyndham franchisees and hotel staff were not taking reasonable steps to identify, report, and respond to known or probable sex trafficking occurring at their hotel properties and were facilitating sex trafficking at the branded hotel properties;

    d. Wyndham's efforts, if any, to stop facilitating sex trafficking in their branded properties were not effective; and

    e. Wyndham and its franchisees were earning revenue by providing venues where widespread and ongoing sex trafficking was occurring.

49. Despite the mounting evidence that sex trafficking at its properties was ongoing and growing, Wyndham chose to earn revenue by continuing conduct that they knew or should have known would facilitate that trafficking.

**b. Defendants had actual and constructive knowledge of widespread and ongoing sex trafficking at the subject Wyndham locations.**

50. Wyndham Defendants were specifically aware that sex trafficking was widespread and ongoing at the subject Wyndham locations.

51. Internet reviews for the subject Wyndham locations, which upon information and belief the Wyndham Defendants manage and monitor, show the pervasiveness of sex trafficking before and well after Jane Doe (M.J.J.) was trafficked. For example:

    • A 2012 Yelp review for the subject La Quinta location states: "Nasty! This place is gross. We stayed here on the last leg of our 1700 mile move... At first we were pleased with the price size and relative cleanliness of the room. That is until... We found a USED CONDOM in the bathroom, like the maids just put the fresh towels on top of it! When we complained about this we weren't offered a refund but instead were mailed a voucher for a free room at any La Quita which we

have tried and tried to use but have been told it is, in effect, worthless. I hate you La Quinta."[21]

- A 2015 Tripadvisor review for the subject La Quinta location states: "Last week I stayed at the San Bernadino location from July 12-17, 2015 while I attended a teacher conference in Loma Linda. When I first walked into my room it struck me as not clean and it wreaked of smoke. As I settled in for the week I noted the mirror splattered with water/toothpaste spots. I wondered what else wasn't cleaned if something as obvious as a mirror wasn't clean. With this in mind, I decided to not let the maids into my room all week because I wondered if they weren't cleaning much while in my room, what WERE they doing? As the week went on, I was so grateful for my decision on a deeper level than I realized at that time. Being from out of state, I had no idea how sketchy the community of San Bernadino is. The city is bankrupt and I heard from 5-7 teachers that work in the San Bernadino school district that there is very real gang, drug dealer, and sex trade activity there. There is a strip club (Flesh Showgirls) 1/2 block from the hotel that apparently is a major gang hangout once the sun goes down. With outdoor entrances to the rooms, I felt very vulnerable from the get-go. The first time I went down to breakfast I noticed a particular guy (creepy looking) just hanging out watching people. He stared at me the whole time I ate. When the same thing happened the next day with the same dude I ended up grabbing my food and eating in my room.  I realized later in the week that he no doubt lived there as I discovered there were lots of individuals living there who are very unsavory to say the least. The stairwells wreaked of urine and there was a constant smell of marijuana in the air around the property. One evening I was up late working on a project that was due at the end of the conference I was attending and went out to throw some of my trash away. Luckily the trash can was only 10 feet from my outside entrance door, because what I observed made me feel even more vulnerable and scared. There were 4-5 big dudes standing outside of hotel room doors up and down the outdoor "hallway" walkways. I got a really bad feeling in my gut and hurried back inside my room as quickly as I could. What were they doing there? Who were they waiting for to emerge from the rooms? Were they staying there or had they walked off the street and ascended the stairs to the 2nd floor? Were they pimps? Drug dealers? After feeling increasingly vulnerable and scared I was elated to pack up and leave the property on Friday. I will never stay at a La Quinta again that I haven't already stayed at based on my experience in San Bernadino. If I were a company I wouldn't want my name associated with the things I observed going on at the San Bernadino location. I think it's a matter of time before something bad happens there. The fact that I did not feel safe at that property is something I feel should be investigated from a business standpoint. The desk staff were always helpful and Alicia, a front desk worker, was especially wonderful. But their clientele that live there and hang-out there must be addressed. I also feel that any hotel with outdoor room entrances need to ensure their visitors feel

---

[21] https://www.yelp.com/biz/super-8-by-wyndham-san-bernardino-san-bernardino

safe. I would drop that particular franchise in a heartbeat if I was legally tied to the San Bernadino La Quinta."[22]

- A 2016 Google review for the subject La Quinta states: "Canceled reservation at motel 6 because of wifi prices and bad reviews.... Should of stayed there, super 8 has amazing rooms but the worst service ever. Racist, expensive deposit, and has a slew of prostitutes walking through out the motel."[23]

- A 2016 Google review for the subject La Quinta states: "well the maids are amazing but there this little rude girl at front desk she should not work here at all no customer service what so ever. they would not give me a receipt. there are hookers here smoking weed kinda ghetto."[24]

- A 2016 Tripadvisor review for the subject La Quinta states: "What an absolute dogpile of a hotel! If you are traveling for business avoid this hotel like the plague. If you think you're getting a great deal and it really isn't a big difference in quality from a Hilton, Marriott, or Hyatt, you'll be mistaken. I ended up here because my company's travel agency Egencia recommended the hotel. I'm positive the only reason for the recommendation was the low price. I won't allow the system to make that mistake for me again. Location: The hotel is actually in an area that doesn't seem that bad. There's a nice set of business parks and retail establishments close by. However the hotel is on the proverbial "wrong side of the tracks". Based on the clientele I saw at the hotel nobody should stay here if they are discerning in anyway. It definitely looks like a drug, prostitute, by-the-hour clientele. Service: don't expect much. The front desk staff tried to stick me in the third floor when my profile clearly indicated I prefer

---

[22] https://www.tripadvisor.com/Hotel_Review-g33009-d77080-Reviews-or15-Super_8_by_Wyndham_San_Bernardino_San_Bernardino_California.html

[23] https://www.google.com/travel/hotels/Super%208%20205%20E%20Hospitality%20Ln,%20San%20Bernardino,%20CA%2092408%20google/entity/CgoI4Ijd7p_N_a52EAE/reviews?g2lb=2502548,2503771,2503781,4258168,4270442,4284970,4291517,4306835,4429192,4515404,4597339,4723331,4731329,4757164,4778035,4814050,4821091,4861688,4864715,4874190,4874725,4886082,4886480,4893075,4902277,4905351,4906019,4926165,4926489,4930751,4930753,4931360,4934309,4934345,4935494,4936396,4937897,47061553&hl=en-US&gl=us&ssta=1&q=Super+8+205+E+Hospitality+Ln,+San+Bernardino,+CA+92408+google&grf=EmQKLAgOEigSJnIkKiIKBwjnDxACGBwSBwjnDxADGAEgADAeQMoCSgcI5w8QARgfCjQIDBIwEi6yASsSKQonCiUweDgwZGNhYzhmYjQ4N2VkNjc6MHg3NjVkZjY2OWZkZDc0NDYw&rp=EOCI3e6fzf2udhDgiN3un839rnY4AkAASAHAAQI&ictx=1&sa=X&ved=2ahUKEwi6yv7VxfH8AhU2LFkFHXT5Ac4Q4gl6BAh7EAU

[24] https://www.google.com/travel/hotels/Super%208%20205%20E%20Hospitality%20Ln,%20San%20Bernardino,%20CA%2092408%20google/entity/CgoI4Ijd7p_N_a52EAE/reviews?g2lb=2502548,2503771,2503781,4258168,4270442,4284970,4291517,4306835,4429192,4515404,4597339,4723331,4731329,4757164,4778035,4814050,4821091,4861688,4864715,4874190,4874725,4886082,4886480,4893075,4902277,4905351,4906019,4926165,4926489,4930751,4930753,4931360,4934309,4934345,4935494,4936396,4937897,47061553&hl=en-US&gl=us&ssta=1&q=Super+8+205+E+Hospitality+Ln,+San+Bernardino,+CA+92408+google&grf=EmQKLAgOEigSJnIkKiIKBwjnDxACGBwSBwjnDxADGAEgADAeQMoCSgcI5w8QARgfCjQIDBIwEi6yASsSKQonCiUweDgwZGNhYzhmYjQ4N2VkNjc6MHg3NjVkZjY2OWZkZDc0NDYw&rp=EOCI3e6fzf2udhDgiN3un839rnY4AkAASAHAAQI&ictx=1&sa=X&ved=2ahUKEwi6yv7VxfH8AhU2LFkFHXT5Ac4Q4gl6BAh7EAU

a lower floor. I was given a key to a first floor room that didn't work. After moving all of my items from my car to the front door of the room then back to my car I received a new key to a new room. They tried to put me on the third floor again. After calling them on this service snafu they were not very pleasant in giving me a key to another first floor room. The room: I was given a non-smoking room per my profile that clearly had smokers in it. The hotel obviously tried to deodorize but it didn't work. As a result I had to put all my clothes back in my car so they would not smell like smoke the next day. The room was generally and surprisingly fairly clean otherwise. The bath is definitely used and worn. Overall, the negative expectations I had of this hotel were met in full. I feared when I booked a La Quinta property it would be a bad choice. My expectations were met completely. If you want a cheap crappy hotel give it a try. If you are a business traveler Used to better accommodations don't even think about it!"[25]

- A 2016 Tripadvisor review for the subject La Quinta states: "Dangerous hotel for a single person or even with someone else. Drug dealers, gangs, prostitute's at hotel. Everything was dirty and unsanitary. Stay somewhere else-there are a lot of other hotels that at least you would feel safe in."[26]

- A 2016 Tripadvisor review for the subject La Quinta states: "Unless you like perverts, drugs, gangs and prostitution you better not spend your money on this place. Everywhere you walk there is a different smell in the air. We were charged full price for checking out 30 minutes late. Very disappointing!"[27]

- A 2016 Tripadvisor review for the subject La Quinta states: "Carpet was filthy, shower was old and had to reattach drainage parts. Smoke from other rooms permeated into my room. Smelt like a stale ashtray. Loud housekeeping staff. Hookers roaming parking lot and knocking on door soliciting. The only positive I can give is it has a pool."[28]

- A 2016 Yelp review for the subject La Quinta states: "This place has a lot of negatives. First, I noticed that the locals (meaning the folks that live at the hotel) are always watching you; very uncomfortable. Second, there is no microwave or refrigerator. Third, prostitution is very obvious. My mother and daughter recognized this the first morning of our stay. Lastly, I was offered drugs (meth). With all this my four day trip turned into two days, and to top it off we were misled on the price of our stay. After reviewing the bill we were overcharged $100. Terrible experience. Never going to stay at a La Quinta again."[29]

---

[25] https://www.tripadvisor.com/Hotel_Review-g33009-d77080-Reviews-or15-Super_8_by_Wyndham_San_Bernardino-San_Bernardino_California.html
[26] *Id.*
[27] *Id.*
[28] *Id.*
[29] https://www.yelp.com/biz/super-8-by-wyndham-san-bernardino-san-bernardino

16

- A 2016 Yelp review for the subject La Quinta states: "This is the worst hotel in San Bernardino. The photos on line are provided by managemebt! Not only is it horribly fifthy, with bugs, and unclean linens, towels, etc. It is right next to a freeway with "hourly clients"--drug dealers, gangs, homeless, prostitutes. The walls are so thin you can hear every word and noise outside. It reeks of cigarette smoke everywhere! The LA Quinta chain has definitely abandoned this place. Not safe for business travelers, single travelers or kids. I can't believe the health department hasn't shut this place down."[30]

- A 2017 Google review for the subject La Quinta states: "If you have children please don't stay here, prostitutes, drug deals, and gang members is what you can expect. When you open the room, stained carpet stained linen and cockroaches is what you will be welcomed to. Terrible establishment."[31]

52.     Traffickers, including Jane Doe (M.J.J.)'s trafficker, repeatedly chose to use these subject Wyndham locations for their sex trafficking activity. As such, Wyndham Defendants also knew or should have known about the pervasive sex trafficking at the Wyndham locations based on obvious indicators of this activity.

53.     Upon information and belief and based on hotel reviews and records of law-enforcement calls, there were multiple trafficking victims exploited at the subject Wyndham locations named herein prior to Jane Doe (M.J.J.)'s trafficking who exhibited "red flags" of trafficking that were observed by hotel staff and management, including paying with cash or prepaid cards, having high volumes of men who not registered guests in and out of their room at unusual times, arriving with few possessions for extended stays, and other signs consistent with the "red flags" of trafficking identified above. Trafficking has a significant effect on its victims,

---

[30] *Id.*

[31] https://www.google.com/travel/hotels/Super%208%20205%20E%20Hospitality%20Ln,%20San%20Bernardino,%20CA%2092408%20google/entity/CgoI4Ijd7p_N_a52EAE/reviews?g2lb=2502548,2503771,2503781,4258168,4270442,4284970,4291517,4306835,4429192,4515404,4597339,4723331,4731329,4757164,4778035,4814050,4821091,4861688,4864715,4874190,4874725,4886082,4886480,4893075,4902277,4905351,4906019,4926165,4926489,4930751,4930753,4931360,4934309,4934345,4935494,4936396,4937897,47061553&hl=en-US&gl=us&ssta=1&q=Super+8+205+E+Hospitality+Ln,+San+Bernardino,+CA+92408+google&grf=EmQKLAgOEigSJnIkKiIKBwjnDxACGBwSBwjnDxADGAEgADAeQMoCSgcI5w8QARgfCjQIDBIwEi6yASsSKQonCiUweDgwZGNhYzhmYjQ4N2VkNjc6MHg3NjVkZjY2OWZkZDc0ODNjYw&rp=EOCI3e6fzf2udhDgiN3un839rnY4AkAASAHAAQI&ictx=1&sa=X&ved=2ahUKEwi6yv7VxfH8AhU2LFkFHXT5Ac4Q4gI6BAh7EAU

and, upon information and belief, there were obvious "red flags" of trafficking apparent from the appearance, demeanor, and restricted movements of these victims, as well as the nature of these victims' interactions with their traffickers and others, all of which provided notice that these victims were being subject to violence, coercion, control, and exploitation.

54.     All knowledge from the staff at these subject Wyndham locations is imputed to Wyndham Defendants. Wyndham Defendants knew about this widespread and ongoing trafficking at these Wyndham locations, including the trafficking of Jane Doe (M.J.J.), through the direct observations of hotel staff, including management-level staff.

55.     Upon information and belief, the Wyndham Defendants knew or should have known about the widespread trafficking at the subject Wyndham locations referenced herein, based on:

      a.   The obligation of hotel staff and hotel management to report suspected criminal activity including sex trafficking to the Wyndham Defendants;

      b.   The Defendants' regular monitoring of online reviews;

      c.   The Defendants' collection and monitoring of customer surveys and complaints;

      d.   The Defendants' regular inspections of the hotel property;

      e.   Information provided to Defendants by law enforcement; and

      f.   Other sources of information available to Defendants.

56.     Upon information and belief, under the Wyndham Defendants' protocols, which on their face required hotel staff and management to report suspected criminal activity to the Wyndham Defendants, hotel staff and management were required to report numerous instances of suspected sex trafficking to the Wyndham Defendants prior to Jane Doe (M.J.J.)'s trafficking based on the numerous "red flags" exhibited by the victims who were exploited at the subject Wyndham locations.

**c. Defendants knew Jane Doe (M.J.J.) was being trafficked at these subject Wyndham locations because of the apparent and obvious "red flags" of sex trafficking.**

57.     During the period that Jane Doe (M.J.J.) was trafficked at the subject Wyndham locations named herein, there were obvious signs that her traffickers were engaged in sex trafficking:

      a.  The hotel rooms in which she was trafficked were frequently paid for with cash or prepaid cards;

      b.  Other girls were trafficked at the same hotel at the same time as Jane Doe (M.J.J.);

      c.  Even though Jane Doe (M.J.J.) and her traffickers would stay for multiple days at a time, housekeeping was kept away by using the "Do Not Disturb" door hanger;

      d.  Housekeeping staff was prevented from entering the room for regular cleaning, towel exchange and other standard room services;

      e.  The traffickers were often present with Jane Doe (M.J.J.) at check in and would linger around the hotel or in the parking lot while she was with a john;

      f.  There was heavy foot traffic in and out of Jane Doe (M.J.J.)'s room involving men who were not hotel guests;

      g.  Jane Doe (M.J.J.) had at least ten (10) johns every day. These individuals entered and left at unusual hours and were present at the hotel for brief periods of time; and

      h.  Other obvious signs of trafficking consistent with the modus operandi of her traffickers and which included well known "red flags" for trafficking in a hotel.

58.     Based upon information and belief, multiple employees at the subject Wyndham locations named herein, including management-level employees, observed, or were made aware of these obvious signs of trafficking while acting within the scope and course of their employment.

59.     As such, Wyndham Defendants knew or was willfully blind to the fact that Jane Doe (M.J.J.) was being trafficked at the subject Wyndham properties.

60.     Given these obvious signs, Wyndham knew or should have known about the trafficking of Jane Doe (M.J.J.) based on its policy or protocol that required hotel staff to report suspected criminal activity including sex trafficking.

**IV.    Defendants actively facilitated sex trafficking at these subject Wyndham locations, including the trafficking of Jane Doe (M.J.J.).**

61.    Wyndham Defendants had both actual and constructive knowledge of the trafficking of Jane Doe (M.J.J.) at these Wyndham locations because the trafficking was the direct result of Wyndham Defendants facilitating her trafficking at the Wyndham locations.

**a.   Franchisee Defendants facilitated the trafficking of Jane Doe (M.J.J.).**

62.    Franchisee Defendants are responsible for the acts, omissions, and knowledge of all employees of these La Quinta and Super 8 locations when operating the hotel because these acts and omissions were committed in the course and scope of employment, because Franchisee Defendants ratified these acts and omissions, and because Franchisee Defendants failed to exercise reasonable care with regard to the hiring, training, and supervision of these employees given the specific risks, known to Franchisee Defendants, of sex trafficking occurring at these La Quinta and Super 8 branded locations including the subject locations.

63.    Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the subject La Quinta and Super 8 locations, Franchisee Defendants continued renting rooms to these traffickers, including the rooms used to sexually exploit victims.

64.    Franchisee Defendants knew or was willfully blind to the fact that Jane Doe (M.J.J.) was being trafficked and, despite this, benefited from continued association with her traffickers by providing them a venue in the form of hotel rooms and related services, to facilitate Jane Doe (M.J.J.)'s sexual exploitation.

65.    Franchisee Defendants also facilitated widespread trafficking at their subject La Quinta and Super 8 locations, including the trafficking of Jane Doe (M.J.J.), in ways including:

   a.   allowing inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to human trafficking;

20

b. inadequate and inadequately enforced sex trafficking notice and training for hotel staff;

c. choosing not to report known or suspected criminal activity including sex trafficking according to reasonable practices, industry standards, and/or applicable franchisor policies and procedures; and

d. implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by the hotel staff.

### b. Wyndham Defendants facilitated the trafficking of Jane Doe (M.J.J.).

66.     Wyndham Defendants are responsible for the acts, omissions, and knowledge of all employees of these Wyndham locations when operating the hotel because these acts and omissions were committed in the course and scope of employment, because Wyndham Defendants ratified these acts and omissions, and because Wyndham Defendants failed to exercise reasonable care with regard to the hiring, training, and supervision of these employees given the specific risks, known to Wyndham Defendants, of sex trafficking occurring at these Wyndham branded locations including the subject locations.

67.     Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the subject Wyndham locations, Wyndham Defendants continued renting rooms to these traffickers, including the rooms used to sexually exploit victims.

68.     Wyndham Defendants knew or was willfully blind to the fact that Jane Doe (M.J.J.) was being trafficked and, despite this, benefited from continued association with her traffickers by providing them a venue in the form of hotel rooms and related services, to facilitate Jane Doe (M.J.J.)'s sexual exploitation.

69.     Wyndham Defendants also facilitated widespread trafficking at their subject Wyndham locations, including the trafficking of Jane Doe (M.J.J.), in ways including:

a.  allowing inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to human trafficking;

b.  inadequate and inadequately enforced sex trafficking notice and training for hotel staff;

c.  choosing not to report known or suspected criminal activity including sex trafficking according to reasonable practices, industry standards, and/or applicable franchisor policies and procedures; and

d.  implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by the hotel staff.

70.     Upon information and belief, the Wyndham Defendants participated directly in aspects of the operation of the subject Wyndham that influenced whether and to what extent trafficking occurred at the hotels, including but not limited to the trafficking of Jane Doe (M.J.J.), as follows:

a.  The Wyndham Defendants have publicly assumed responsibility and control over the human trafficking response of all Wyndham properties, including design and implementation of practices to prevent trafficking, safety and security procedures, employee and franchisee education, training, and response, partnership with external organizations, and advocacy;

b.  The Wyndham Defendants retained control over when its branded hotels would share information with law enforcement and when law enforcement would be contacted about suspected criminal activity in Wyndham branded hotels;

c.  The Wyndham Defendants retained control over the response to trafficking by creating a reporting hotline for hotel staff and franchisees to report suspected human trafficking to the Wyndham Defendants. The Wyndham Defendants determined when issues should be escalated to the National Human Trafficking Hotline or law enforcement;

d.  The Wyndham Defendants retained control over determining which hotels needed additional training or other resources based on a high risk of human trafficking and other related criminal activity;

e.  The Wyndham Defendants expressly retained control to terminate hotel staff and/or a franchising agreement based on the response to human trafficking;

f.   The Wyndham Defendants retained control, at the brand-wide level, over training on how to spot the signs of and help prevent human trafficking. The Wyndham Defendants determined whether the training is provided, when it is provided, the content of the training, how the training is delivered, who receives the training, and the consequences if someone does not participate in the training or fails to follow such training;

g.   Although they delayed making any reasonable effort to do so, the Wyndham Defendants acknowledge that they retain control to adopt requirements for franchised hotels specifically designed to prevent human trafficking and other criminal activity;

h.   The Wyndham Defendants maintain a Safety & Security Team and a Critical Incident Rapid Response Team that are charged with investigating and responding to potential criminal incidents at all Wyndham properties, including suspected trafficking incidents;

i.   The Wyndham Defendants are responsible for adopting, enforcing, and monitoring policies and codes of conduct related to human trafficking at the subject Wyndham locations;

j.   The Wyndham Defendants maintained control over all details of the terms under which franchised hotels, including the subject Wyndham locations, offered internet services to customers, including dictating the software, hardware, and service provider to be used, setting all policies about use and restrictions on use, and actively collecting and monitoring guest internet usage data. The Wyndham Defendants dictated whether sites frequently used to solicit clients for sex trafficking victims would be accessible through the internet at the subject Wyndham locations;

k.   The Wyndham Defendants retained control over the setting, supervision, overseeing, and enforcement of detailed policies and protocol for housekeeping services at the subject Wyndham locations, including policies for how often rooms must be entered, how to respond to guest refusals of entry into rooms, and steps to monitor guest safety issues through housekeeping services; and

l.   The Wyndham Defendants collected, maintained, and analyzed detailed data regarding housekeeping services at the subject Wyndham locations, including trends that would reveal patterns consistent with human trafficking.

71.   Wyndham directly participated in and retained day-to-day control over renting rooms at the subject Wyndham locations by, among other things:

a.   The Wyndham Defendants controlled all details of the guest reservation, check-in, and payment processes through management and control over all systems used for

those processes and adoption of detailed and specific policies governing the means and methods used for each of these processes;

b.  The Wyndham Defendants directly made reservations for rooms at the subject Wyndham locations and accepted payment for those rooms through a central reservation system that they controlled and operated. The Wyndham Defendants could reserve rooms and accept payments without requiring franchisee approval or involvement;

c.  The Wyndham Defendants established and maintained control over a brand-wide "do not rent" system. The Wyndham Defendants set all policies related to use of this system and dictated the day-to-day details of reservations at the subject Wyndham locations through detailed policies that it established regarding use of this "do not rent" system;

d.  The Wyndham Defendants controlled room rates, required discounts, mandatory fees, and rewards program;

e.  The Wyndham Defendants controlled and restricted the ability of franchisee and staff to refuse or cancel a reservation;

f.  The Wyndham Defendants controlled and oversaw policies and procedures regarding check-in, payment, and identity verification procedures;

g.  The Wyndham Defendants collected, retained, monitored, and analyzed detailed data about every guest who stayed at the subject Wyndham locations;

h.  The Wyndham Defendants established detailed policies and protocol that dictated, step-by-step, everything that would happen from the time a guest arrived at the subject Wyndham locations until they entered their guest room. This included operational directives regarding payment methods, identification requirements, the number of guests that could be in each room and whether information needed to be collected for each guest, what questions hotel staff should and should not ask, and other matters related to check-in; and

i.  The Wyndham Defendants required franchisees to use Wyndham's property management system, which was owned, maintained, controlled, and operated by the Wyndham Defendants, for virtually all aspects of hotel operations regarding room reservations and payment.

72.  Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the subject Wyndham locations named herein, Wyndham continued renting rooms to traffickers, including the rooms used to sexually exploit victims, including Jane Doe (M.J.J.).

73.     Wyndham knew or should have known that Jane Doe (M.J.J.) was being trafficked and, despite this, benefited from continued association with her traffickers by providing them hotel rooms and related services to facilitate Jane Doe (M.J.J.)'s sexual exploitation.

74.     Upon information and belief, despite having actual or constructive knowledge of the ongoing sex trafficking at the subject Wyndham locations, the Wyndham Defendants continued participating in a venture at these hotels, with its franchisees and hotel staff, in a way that it knew or should have known would lead to additional sex trafficking at the hotels, including but not limited to by the following:

   a.  The Wyndham Defendants adopted inappropriate and inadequate practices for selecting, training, supervising, managing, and disciplining franchisees and hotel staff regarding issues related to human trafficking;

   b.  The Wyndham Defendants provided inadequate training on issues related to human trafficking and unreasonably delayed providing training;

   c.  The Wyndham Defendants adopted a safety and security budget and safety and security practices that were clearly insufficient considering the known problem of sex trafficking at Wyndham properties;

   d.  The Wyndham Defendants implicitly approved decisions by franchisees and hotel staff not to report or respond to criminal activity including sex trafficking appropriately;

   e.  The Wyndham Defendants continued to use policies, protocols, and practices that had been shown to lead to widespread trafficking at the subject Wyndham locations;

   f.  The Wyndham Defendants attracted traffickers by affirmatively creating a favorable venue where access was easy, risks of interference were low, and traceability was minimal;

   g.  Despite having specific knowledge of policies that would significantly reduce sex trafficking at its branded locations including the subject Wyndham locations, the Wyndham Defendants declined to implement policies that would likely have the effect of reducing its sex-trafficking related profits or that would require publicly acknowledging the ongoing problem of sex trafficking at its properties;

   h.  The Wyndham Defendants willfully delayed taking obvious and apparent steps to stop facilitating sex trafficking, which they had the ability and responsibility to take sooner;

i.  The Wyndham Defendants allowed traffickers to reserve rooms using cash, which provided relative anonymity and non-traceability; and

j.  The Wyndham Defendants provided traffickers with access to internet services in a manner that the Wyndham Defendants knew or should have known would be used to facilitate trafficking by promoting commercial sex services online.

75.  If Wyndham had exercised reasonable diligence when operating their Wyndham properties and in the areas where it retained control, Wyndham would have prevented the subject Wyndham locations from being used to facilitate widespread and ongoing sex trafficking, including the trafficking of Jane Doe (M.J.J.). Instead, Wyndham engaged in the course of conduct that affirmatively facilitated widespread and ongoing sex trafficking, including the trafficking of Jane Doe (M.J.J.).

**V.   Defendants' Ventures at the La Quinta and Super 8 properties.**

76.  Through the conduct described above, Wyndham Defendants knowingly benefited from engaging in a venture with sex traffickers at the subject Wyndham locations named herein, including Jane Doe (M.J.J.)'s traffickers, as follows:

a.  Wyndham and Franchisee Defendants both received benefits, including increased revenue, every time a room was rented at any Wyndham locations;

b.  This venture engaged in violations of 18 U.S.C. §1591 through the actions of the criminal traffickers at the Wyndham locations, which Wyndham and Franchisee Defendants knew or should have known about;

c.  Wyndham and Franchisee Defendants associated with traffickers, including Jane Doe (M.J.J.)'s traffickers, by acting jointly to continue to rent rooms to these traffickers despite having actual or constructive knowledge of their sex trafficking activity;

d.  Wyndham and Franchisee Defendants had a mutually beneficial relationship with the traffickers at the Wyndham locations, fueled by sexual exploitation of victims, including Jane Doe (M.J.J.);

e.  Sex traffickers, including Jane Doe (M.J.J.)'s traffickers, frequently used the Wyndham locations for their trafficking because of an implicit understanding that the Wyndham locations were an avenue that would facilitate their trafficking, providing minimal interference and lowering their risk of detection. This

understanding occurred because of the conduct of Wyndham and Franchisee Defendants facilitating that trafficking as described throughout this Complaint. This resulted in benefits, including increased revenue, for Wyndham and Franchisee Defendants;

f.   Wyndham and Franchisee Defendants participated in this venture through the conduct described throughout Plaintiff's Original Complaint, as they were jointly responsible for relevant aspects of hotel operations; and

g.   Jane Doe (M.J.J.)'s trafficking at the subject Wyndham locations was a result of Wyndham and Franchisee Defendants' participation in a venture with criminal traffickers. If Wyndham and Franchisee Defendants had not continued participating in a venture that they knew or should have known violated 18 U.S.C. §1591(a), they would not have received a benefit from Jane Doe (M.J.J.)'s trafficking at the subject Wyndham locations.

77.    Through the conduct described above, Wyndham also knowingly benefited from engaging in a commercial venture with Franchisee Defendants operating the La Quinta and Super 8 locations as follows:

a.   Wyndham associated with Franchisee Defendants to operate the La Quinta and Super 8 locations;

b.   Pursuant to the terms of the franchising agreement, both Wyndham and Franchisee Defendants received financial benefits from operating the La Quinta and Super 8, including revenue generated specifically by renting rooms to traffickers. They engaged in revenue sharing and had a common incentive to maximize revenue;

c.   By participating in a venture that facilitated sex trafficking, each Wyndham and Franchisees also benefitted by keeping operating costs low, maintaining the loyalty of the segment of their customer base that seeks to participate in the sex trade and by not acknowledging the pervasive nature of sex trafficking in their hotels generally and the subject La Quinta and Super 8 locations specifically;

d.   This venture violated 18 U.S.C. §§ 1591(a) and 1595(a) through the conduct of Franchisee Defendants and the widespread sex trafficking at the subject La Quinta and Super 8 locations named herein;

e.   Despite its actual or constructive knowledge that the venture was engaged in violations of 18 U.S.C. §§ 1591(a) and 1595(a), Wyndham participated in the venture by continuing to associate with Franchisee Defendants to operate the La Quinta and Super 8 locations named herein in a way that it knew or should have known would lead to further violations of 18 U.S.C. §1591(a), including trafficking of victims like Jane Doe (M.J.J.); and

f.  Jane Doe (M.J.J.)'s trafficking at the La Quinta and Super 8 locations named herein was a result of Wyndham's and Franchisee Defendants' facilitation of the widespread and ongoing violations of 18 U.S.C. §§ 1591(a) and 1595(a) at the La Quinta and Super 8 locations. Had Wyndham not continued participating in a venture that it knew or should have known was engaged in violations of 18 U.S.C. §§ 1591(a) and 1595(a), it would not have received a benefit from Jane Doe (M.J.J.)'s trafficking at the subject La Quinta and Super 8 location named herein.

## VI.   Franchisee Defendants and the Staff at the La Quinta and Super 8 Locations Named Herein Acted as Actual Agents of Wyndham.

78.   Wyndham is vicariously liable for the acts, omissions, and knowledge of Franchisees and staff at the subject La Quinta and Super 8 locations named herein, which are Wyndham's actual agents or subagents.

79.   The Wyndham Defendants subjected Franchisee Defendants to detailed standards and requirements regarding the operation of the subject La Quinta and Super 8 locations named herein through the franchising agreements, through detailed written policies and manuals, and through other formal and informal protocols, directives, mandates, and expectations imposed by the Wyndham Defendants.

80.   The Wyndham Defendants obscure the full extent of control they exercise over the franchisees by treating the manuals and certain policies as confidential and proprietary and prohibiting any public disclosure of those policies and manuals. Upon information and belief, the standards that the Wyndham Defendants imposed on the franchisees:

a.  did not merely identify quality or outcome standards but instead specifically controlled the means, methods, and tools Franchisee Defendants used at the subject La Quinta and Super 8 locations;

b.  covered virtually all aspects of hotel operations, including internal operating functions;

c.  dictated the specific manner in which Franchisee Defendants and hotel staff must carry out most day-to-day functions at the subject La Quinta and Super 8 locations; and

      d.  significantly exceeded what was necessary for Wyndham to protect its registered trademarks.

81.    In addition to the ways described above, upon information and belief, Wyndham exercised and reserved the right to exercise systemic and pervasive control over Franchisee Defendants' day-to-day operation of the subject La Quinta and Super 8 locations named herein, including the following ways:

      a.  The Wyndham Defendants required franchisees and management of franchised hotels to participate in mandatory training programs, both during onboarding and on an ongoing basis. This training covered all aspects of hotel operations, including aspects of hotel operations that go significantly beyond what would be necessary for the Wyndham Defendants to protect their registered trademarks;

      b.  The Wyndham Defendants provided training for hotel management and select hotel staff on-site at the subject La Quinta and Super 8 and at locations selected by the Wyndham Defendants;

      c.  The Wyndham Defendants required all hotel staff to participate in training it created through an online learning platform it controlled and maintained;

      d.  The Wyndham Defendants controlled training provided by franchisees to hotel staff by dictating the content of that training, providing required content for that training, and dictating the training methods used;

      e.  The Wyndham Defendants retained sole discretion to determine whether all training had been completed satisfactorily;

      f.  For certain products and services that franchisees were required to purchase to operate the subject La Quinta and Super 8 locations named herein, the Wyndham Defendants designated approved vendors and prohibited franchisees from purchasing goods and services from anyone other than an approved vendor;

      g.  The Wyndham Defendants required franchisees to sign a technology agreement governing the terms under which franchisees must procure and use technical services and software while operating the subject La Quinta and Super 8 locations named herein. Franchisees were required to install, and use certain brands, types, makes, and/or models of hardware, software, peripheral equipment, and support services to perform internal operating functions at the hotel;

      h.  The Wyndham Defendants set required staffing levels for the subject La Quinta and Super 8 locations named herein;

      i.  The Wyndham Defendants established detailed job descriptions for all positions in its La Quinta and Super 8 properties and drafted numerous, detailed policies that

referenced these positions and dictated which positions must perform which tasks and how they must do so;

j.   The Wyndham Defendants set requirements for the hiring process used by franchisees and oversaw employee discipline processes and termination decisions;

k.   The Wyndham Defendants provided benefits for employees of franchised hotels;

l.   The Wyndham Defendants required Defendant Franchisees to use a customer resource management program maintained and operated by the Wyndham Defendants;

m.   The Wyndham Defendants controlled channels for guests to report complaints or provide feedback regarding the subject La Quinta and Super 8 locations and directly participated in the response and/or supervised the response to customer complaints or other feedback. The Wyndham Defendants retained the right to provide refunds or other compensation to guests and to require Defendant Franchisees to pay associated costs;

n.   The Wyndham Defendants generated reports and analysis of guest complaints and online reviews for the subject La Quinta and Super 8 locations;

o.   The Wyndham Defendants required Defendant Franchisees to use a Guest Relations Application owned, operated, and maintained by the Wyndham Defendants to manage all guest data and information. The Wyndham Defendants could use the backend of this system to analyze data and generate reports;

p.   The Wyndham Defendants set detailed requirements for insurance that franchisees must purchase and retain the right to purchase insurance for franchisees and to bill franchisees directly for that insurance if the Wyndham Defendants determined that the franchisees have not purchased adequate insurance;

q.   The Wyndham Defendants regularly audited the books and records of Defendant Franchisees;

r.   The Wyndham Defendants conducted frequent and unscheduled inspections of La Quinta and Super 8 properties, including the subject La Quinta and Super 8 locations named herein;

s.   The Wyndham Defendants retained the right to issue fines, require additional training, to impose and supervise implementation of detailed corrective action plans, and to take other steps up to and including termination of the franchising agreements if franchisees violated any of the Wyndham Defendants' detailed rules, expectations, protocols, or policies, including those that governed day-to-day operations of the subject La Quinta and Super 8 location named herein;

t.  The Wyndham Defendants controlled all marketing for the subject La Quinta and Super 8 locations and prohibited franchisees from maintaining any online presence unless specifically reviewed and approved by the Wyndham Defendants;

u.  The Wyndham Defendants imposed detailed recordkeeping and reporting requirements on Defendant Franchisees regarding virtually all aspects of hotel operations;

v.  The Wyndham Defendants supervised and controlled day-to-day operations of the subject La Quinta and Super 8 locations named herein through detailed information and extensive reports that it obtained through the property management system and other software systems it required Defendant Franchisees to use; and

w.  The Wyndham Defendants retained the virtually unlimited right to revise policies or adopt new requirements for the day-to-day aspects of hotel operations.

**VII.  Defendants are Jointly and Severally Liable for Jane Doe (M.J.J.)'s Damages.**

82.  The venture or ventures in which each Defendant participated were direct, producing, and proximate causes of the injuries and damages to Jane Doe (M.J.J.).

83.  Under the TVPRA, Defendants are jointly and severally liable for all damages that a jury awards to Jane Doe (M.J.J.) for past and future losses she suffered as a proximate result of her sexual exploitation and trafficking.

**CAUSE OF ACTION—SEX TRAFFICKING UNDER THE TVPRA**

84.  Jane Doe (M.J.J.)  incorporates all previous allegations.

**I.  Count 1: Perpetrator liability under 18 U.S.C §1595(a) based on violation of 18 U.S.C §1591(a).**

85.  Jane Doe (M.J.J.) is a victim of sex trafficking within the meaning of §1591 and 1595(a) and is thus entitled to bring a civil action under 18 U.S.C §1595(a) against the "perpetrator" of any violation of the TVPRA.

86.  Wyndham and Franchisee Defendants are perpetrators within the meaning of 18 U.S.C §1595(a) because Wyndham and Franchisee Defendants:

a.  violated 18 U.S.C §1591(a)(1) when, through the acts and omissions described throughout this Complaint, it harbored individuals (including Jane Doe (M.J.J.)

knowing or in reckless disregard of the fact that the victims would be caused, through force, coercion, or fraud, to engage in commercial sex acts while at its respective hotel property; and

b.  violated 18 U.S.C §1591(a)(2) when, through the acts and omissions described throughout this Complaint, it knowingly received financial benefit by knowingly assisting, supporting, or facilitating a venture that was engaged in violations under 18 U.S.C §1591(a)(1) at its respective hotel properties.

87.     Violations of 18 U.S.C §1595(a) by each of the Defendants as "perpetrators" operated, jointly, with other unlawful acts and omissions alleged in this Complaint, to cause Jane Doe (M.J.J.) to suffer substantial physical and psychological injuries and other damages because of being trafficked and sexually exploited at the Defendants' hotel properties.

**II.     Count 2: Beneficiary Liability under §1595 (a) of the TVPRA.**

88.     Jane Doe (M.J.J.) is a victim of sex trafficking within the meaning of 18 U.S.C §§ 1591 and 1595(a) and is thus entitled to bring a civil action under the "beneficiary" theory in 18 U.S.C §1595(a) against anyone who knowingly benefited from participation in a venture that the person knew or should have, with reasonable diligence, known was engaged in a violation of the TVPRA.

89.     Through acts and omissions described throughout this Complaint, Franchisor Defendants and Franchisee Defendants received a financial benefit from participating in a venture with traffickers, including Jane Doe (M.J.J.)'s traffickers, despite the fact that each defendant knew or should have known that these traffickers, including Jane Doe (M.J.J.)'s traffickers, were engaged in violations of 18 U.S.C §1591(a)(1) and 18 U.S.C §1591(a)(2). Thus, Franchisor Defendants and Franchisee Defendants are liable as a beneficiary under 18 U.S.C §1595(a).

90.     Through the acts and omissions described throughout this Complaint, Franchisor Defendants received a financial benefit from participating in a venture with its respective franchisees regarding the operations of its respective hotel properties even though Franchisor

Defendants knew or should have known that this venture was violating 18 U.S.C §§ 1591(a) and 1595(a).

91.     Violations of 18 U.S.C §1595(a) by Wyndham Defendants as "beneficiaries" operated, jointly, with other unlawful acts and omissions alleged in this Complaint, to cause Jane Doe (M.J.J.) to suffer substantial physical and psychological injuries and other damages because of being trafficked and sexually exploited at the Defendants' hotel properties.

### III.     Count 3: Vicarious Liability for TVPRA Violations.

92.     Franchisee Defendants acted as the actual agent of its respective Franchisor Defendants when operating its respective hotel property.

93.     Through the acts and omissions described throughout this Complaint, Franchisor Defendants exercised or retained the right to exercise systematic and day-to-day control over the means and methods used by its franchisees to operate its respective hotel property.

94.     Under the TVPRA and the federal common law, a principal is vicariously liable for the violations of its actual agents and its subagents.

95.     Franchisor Defendants are vicariously liable for the TVPRA violations of its franchisees and the subagents of that franchisee.

96.     As alleged above, Wyndham is directly liable to Jane Doe (M.J.J.) for violations of the TVPRA, both as a perpetrator under 18 U.S.C §1591(a) and as a beneficiary under 18 U.S.C §1595(a). Franchisee Defendants are also directly liable to Jane Doe (M.J.J.) under § 2255. G6 is vicariously liable to Jane Doe (M.J.J.) for those same violations.

### <u>DAMAGES</u>

97.     Wyndham and Franchisee Defendants' acts and omissions, individually and collectively, caused Jane Doe (M.J.J.) to sustain legal damages.

98.     Wyndham and Franchisee Defendants are joint and severally liable for all past and future damages sustained by Jane Doe (M.J.J.).

99.     Jane Doe (M.J.J.) is entitled to be compensated for personal injuries and economic damages, including:

   a.   Actual damages (until trial and in the future);

   b.   Incidental and consequential damages (until trial and in the future);

   c.   Mental anguish and emotional distress damages (until trial and in the future);

   d.   Lost earnings and lost earning capacity (until trial and in the future);

   e.   Necessary medical expenses (until trial and in the future);

   f.   Life care expenses (until trial and in the future);

   g.   Physical pain and suffering (until trial and in the future);

   h.   Physical impairment (until trial and in the future);

   i.   Exemplary/Punitive damages;

   j.   Attorneys' fees;

   k.   Costs of this action; and

   l.   Pre-judgment and all other interest recoverable.

## **JURY TRIAL**

100.    Jane Doe (M.J.J.) demands a jury trial on all issues.

## **RELIEF SOUGHT**

101.    WHEREFORE, Jane Doe (M.J.J.) prays that this case be set for trial before a jury and that, upon a final hearing of the cause, judgment be entered for Jane Doe (M.J.J.) against all Defendants jointly and severally for the actual, compensatory, and punitive damages as the evidence may show, and the jury may determine to be proper, together with the costs of suit,

prejudgment interest, post-judgment interest, and such other and further relief to which Jane Doe

(M.J.J.) may, in law or in equity, show herself to be justly entitled.

Respectfully submitted,

**THE LOCKS LAW FIRM**

*/s/ Francesca A. Iacovangelo, Esq.*
Francesca A. Iacovangelo, Esq.
601 Walnut Street, Suite 720 E
Philadelphia, PA 19106
(215) 893-3454
(215) 893-3444 Facsimile
fiacovangelo@lockslaw.com
**ATTORNEYS FOR PLAINTIFF**